UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
**Maria F. Freitas,**               )
                                    )
      **Plaintiff,**    )
                                    )
      v.               )    Civil Action No. 10-10594-DJC
                                    )
**Michael J. Astrue, Commissioner,**)
**Social Security Administration,** )
                                    )
      **Defendant.**    )
_____ )

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                                             July 18, 2011

### I.    Introduction

Plaintiff Maria F. Freitas ("Freitas") filed claims for disability insurance benefits ("SSDI") and supplemental security income ("SSI") with the Social Security Administration. Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Freitas brought this action for judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of the Social Security Administration ("the Commissioner"), denying her claim. Before the Court are Freitas' Motion to Reverse and the Commissioner's Motion to Affirm that decision. For the reasons discussed below, Freitas' motion is DENIED, the Commissioner's motion is GRANTED and the final decision of the Commissioner is AFFIRMED.

### II.    Factual Background

Freitas was 42 years old when she ceased working on July 1, 2007. R. 10, 17, 129.[1] Freitas

---

[1] Citations to the administrative record in this case, Docket #13, shall be to "R.___."

1

lives at home with her husband, three children and her three-year-old granddaughter. R. 24. Freitas had previously worked as a sewing machine operator and a certified nurse's assistant ("CNA"). R. 49, 119. Freitas attended school in Portugal for six years, completing the 4th grade and later completing a nurse's aid course in the United States to work as a CNA. Pl's. Memo at 4; R. 24-25. Freitas alleges that she is unable to work due to (1) chronic abdominal pain as a result of her breast cancer surgery, (2) chronic pain and weakness as a result of her thyroid cancer, (3) fibromyalgia and (4) depression associated with headaches, insomnia, fatigue, loss of energy, feelings of hopelessness and anxiety. R. 134, 159, 170, 179.

### III. Procedural Background

Freitas filed claims for SSDI and SSI with the Social Security Administration on July 27, 2007, asserting that she was unable to work as of July 1, 2007. R. 104. After initial review, her claims were denied on October 24, 2007. R. 62. Her claims were reviewed by a Federal Reviewing Official and again denied on September 10, 2008. R. 54. On September 16, 2008, Freitas filed a timely request for a hearing before an ALJ pursuant to SSA regulations. R. 71. A hearing was held before an ALJ on October 29, 2009. R. 21. In a written decision dated November 23, 2009, the ALJ found that Freitas was not disabled under sections 216(I) and 223(d) of the Social Security Act. R. 18.

The ALJ also notified Freitas that the SSA's Decision Review Board ("the Board") had selected her claim for review. R. 5. The Board issued its decision on February 26, 2010 and adopted the ALJ's decision in its entirety. R. 1. Accordingly, the ALJ's decision is the final decision of the Commissioner of Social Security. Id.

## IV. Discussion

### A. Legal Standards

#### 1. Entitlement to Disability Benefits and Supplemental Security Income

A claimant's entitlement to SSDI and SSI turns in part on whether he or she has a "disability," defined in the Social Security context as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 416(I), 423(d)(1)(a); 20 C.F.R. § 404.1505. See Belanger v. Apfel, 113 F.Supp.2d 191, 195 (D. Mass. 2000) (discussing relevant statutes and regulations). The inability must be severe, rendering the claimant unable to do his or her previous work or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511. See Rodriguez v. Sec'y of Health and Human Servs., 893 F.2d 401, 402 (1st Cir. 1989) (discussing relevant statutes and regulations).

The Commissioner must follow a five-step process when he determines whether an individual has a disability for Social Security purposes and, thus, whether that individual's application for benefits will be granted. 20 C.F.R. § 416.920; see Anderson v. Sec'y of Health & Human Servs., 634 F.Supp. 967, 970 (D. Mass. 1984) (discussing relevant statutes and regulations). All five steps are not applied to every applicant; the determination may be concluded at any step along the process. Id. First, if the applicant is engaged in substantial gainful work activity, then the application is denied. Id. Second, if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, then the application is denied. Id. Third, if the impairment meets the conditions for one of the "listed" impairments in the Social

3

Security regulations, then the application is granted. Id. Fourth, if the applicant's "residual functional capacity" ("RFC") is such that he or she can still perform past relevant work, then the application is denied. Id. Fifth and finally, if the applicant, given his or her RFC, education, work experience, and age, is unable to do any other work, the application is granted. Id.

### 2. Standard of Review

This Court has the power to affirm, modify, or reverse a decision of the Commissioner upon review of the pleadings and record. 42 U.S.C. § 405(g). Such review, however, is "limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citing Manso-Pizarro v. Sec'y of Health and Human Servs., 76 F.3d 15, 16 (1st Cir. 1996)). The ALJ's findings of fact are conclusive when supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

## B. Before the ALJ

### 1. Medical History

In making his determination regarding Freitas' application for SSDI and SSI benefits, the ALJ had before him medical evidence concerning Freitas' breast cancer surgery, thyroid surgery, fibromyalgia, and depression. Freitas' medical history included multiple medical reports for each of these four impairments.

### a. Breast Cancer Surgery

#### I. Dr. Michelle Annette Gadd

The report of Dr. Michele Annette Gadd, a physician who treated Freitas for breast cancer (DCIS)[2], showed that Freitas had a mastectomy to surgically remove the extensive carcinoma in Freitas' right breast. R. 249. Dr. Gadd also suggested radiation as treatment for the cancer in her left breast. Id. Freitas' surgery was performed in January of 2006. R. 237-38. By August 28, 2007, Freitas showed no sign of recurrence of the breast cancer and her physicians noted her condition was "stable" and "excellent." R. 249, 349.

#### ii. Dr. Alex A. Teixeira

Freitas' surgery involved abdominal reconstruction and a hernia repair on her right side. R. 1095-96. On January 13, 2009, Dr. Alex A. Teixeira examined Freitas to assess her chronic abdominal pain after a history of breast cancer. Id. Dr. Teixeira's assessment of Freitas revealed that her pain was likely a result of her history of abdominal surgery. Id. Dr. Teixeira found, after extensive evaluation with endoscopy and radiology, that all of Freitas' tests were unremarkable. Id.

### b. Thyroid Cancer

#### I. Dr. James Warsaw

In October 2007, Dr. James Warsaw treated Freitas in regard to her thyroid ultrasound and her history of hypothyroidism. R. 603, 607. Dr. Warsaw examined Freitas' thyroid ultrasound and recommended surgery for a possible papillary thyroid carcinoma. Id. The thyroidectomy surgery

---

[2] Ductal carcinoma in situ (DCIS) is the earliest form of breast cancer and although it is not life-threatening, it does require treatment to prevent the condition from becoming invasive. Ductal carcinoma in situ, Mayo Clinic (June 23, 2011), http://www.mayoclinic.com/health/dcis/DS00983.

was performed on January 31, 2008. R. 864. Afterward, Freitas continued to report some symptoms, but Dr. Warsaw saw no evidence of recurrence of the thyroid cancer. R. 1003.

### c. Fibromyalgia

#### I. Dr. Burton Sack

Dr. Burton Sack, a rheumatologist, treated Freitas for pain in her muscles and joints. R. 973. Freitas' medical record indicates she was diagnosed with fibromyalgia in the past. R. 273.[3] Dr. Sack's examination identified "trigger points" in Freitas' posterior neck, anterior neck, suprascapula, trapezius, medial and lateral elbows, pelvic brim, lateral hips, medial knees and Achilles. R. 973. Dr. Sack's examination showed Freitas still had a full range of motion. Id.

#### ii. Dr. Sarah Borja-Chua

Dr. Sarah Borja-Chua was Freitas' primary care physician and treated her for fibromyalgia. R. 137, 1150. On May 22, 2007, Dr. Borja-Chua ordered a MRI of Freitas' thoracic spine, which revealed a small abnormality. R. 216. The remainder of the test was unremarkable and did not indicate that Freitas had degenerative disc disease. Id. Dr. Borja-Chua prescribed Oxycodone and Hydrocodone to manage Freitas' fibromyalgia pain. R. 990, 1151, 1188-90.

Dr. Borja-Chua provided a Medical Source Statement of Ability to do Work-Related Activities that confirmed that Freitas could lift up to ten pounds occasionally and could carry up to twenty pounds occasionally. R. 1179. Dr. Borja-Chua determined that Freitas could, in an eight-hour work day, sit for up to four hours, stand for two hours and walk for two hours. R. 1180. Dr.

---

[3] "Fibromyalgia syndrome is a common disorder characterized by multiple tender points, widespread deep muscle pain, fatigue, and depression." Fibromyalgia Tender Points, WebMD (June 30, 2011), http://www.webmd.com/fibromyalgia/guide/fibromyalgia-tender-points-trigger-points.

Borja-Chua indicated that Freitas could, among other things, shop, travel without assistance, prepare meals and take care of her personal hygiene. R. 1184.

### iii.    Dr. Allison L. Gorski

In May of 2009, Dr. Allison L. Gorski had her first consultation with Freitas to discuss Freitas' abdominal pain and chronic lower back pain. R. 1188. Freitas complained of pain that began three to four years earlier. Id. Although Freitas complained of sharp burning pain, the results of an abdominal and pelvic CT, a lumbar MRI and thoracic spine X-rays all showed no abnormal findings. Id. Dr. Gorski noted that during the examination, Freitas was alert, oriented, sat comfortably on the chair and showed full range of motion of her lumbar spine. R. 1189, 1192, 1194.

In October 2009, Dr. Gorski also submitted a Medical Source Statement of Ability to do Work-Related Activities which indicates that Freitas was able to lift and carry up to ten pounds frequently and twenty pounds occasionally. R. 1209. Dr. Gorski stated that during an eight-hour work day Freitas could sit for four hours and stand and walk for two hours. R. 1210. This assessment indicates that Freitas could, among other things, also "travel without a companion," "prepare simple meal[s]" and "take care of personal hygiene." R. 1214. The report indicates Freitas occasionally needed a cane to walk distances over 20 yards. R. 1210.

### d.    Depression

### I.    Ms. Linda D'Ambly

After Freitas was diagnosed with breast cancer, Freitas began to visit Ms. Linda D'Ambly, a licensed social worker and counselor, to discuss her ability to focus and concentrate at work. R. 182. On November 18, 2005, Ms. D'Ambly examined Freitas and diagnosed her with severe depression. Id. Ms. D'Ambly noted that Freitas' daily activities were impaired because Freitas had

difficulty maintaining concentration and attention on tasks. Id.

From 2007 to early 2008, the sessions with Ms. D'Ambly revolved around Freitas' fear of becoming sick again and the anxiety she felt about potential medical problems in the future. R. 849-52, 855. Freitas and Ms. D'Ambly consistently discussed the difficulty Freitas' depression caused with respect to work and family. R. 856. Ms. D'Ambly indicated that Freitas complained that pain made Freitas feel sick and tired. R. 851, 854. Ms. D'Ambly's reports from late 2008 indicate that Freitas continued to improve with medication and that Freitas' outlook improved except when she contemplated the possibility of facing another surgery. R. 1015, 1017, 1021.

### ii. Dr. Shalini Mansharinani

In September 2007, Dr. Shalini Mansharinani, a psychiatrist, began to treat Freitas for her stress, tiredness, and fear of death. R. 14, 416-22. Freitas maintained she was unable to work because of fainting and other related symptoms. R. 420. Dr. Mansharinani also noted that Freitas had a Global Assessment of Functioning ("GAF") score of 60 indicating moderate symptoms or moderate difficulty in social, occupational or school functioning.[4] R. 422.

In Dr. Mansharinani's Medical Source Statement of Ability to do Work Related Activities, she stated that Freitas had no restriction in her ability to understand, remember and carry our simple instructions and had a moderate restriction with simple work related decisions. R. 1228. Dr. Mansharinani noted that Freitas had some marked restrictions in carrying our complex work related

---

[4]The GAF scale is used to report a clinician's judgment of an individual's overall level of psychological, social, and occupational functioning and refers to the level of functioning at the time of evaluation. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32-33 (4th ed., text rev. 2000) ( "DSM-IV"). GAF scores in the 51-60 range indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV 34.

8

activities. Id. With respect to work interactions, Dr. Mansharinani indicated that Freitas had a marked restriction in her ability to respond to changes in the work setting, but only moderate restrictions in her ability to interact with co-workers and supervisors and a mild restriction in her ability to interact with the public. R. 1229.

### iii. Dr. Borja-Chua

Dr. Borja-Chua agreed with Ms. D'Ambly and Dr. Mansharinani that Freitas was unable to perform her past work because of Freitas' difficulty in concentration and attention when doing housework, citing two episodes of Freitas burning food while cooking. R. 424-26. However, Dr. Borja-Chua's treatment records also indicate Freitas was still able to perform activities such as shopping and traveling outside of her home. Id.

### 2. ALJ Hearing

At the October 29, 2009 administrative hearing, the ALJ heard testimony from both Freitas and vocational expert ("VE") Albert Sabella.

#### a. Freitas' Testimony

Freitas testified that she suffered from constant fatigue, lack of energy, dizziness, fainting, abdominal pain and general muscle pain. R. 27, 30-31. She testified that these conditions made it difficult for her to get ready for work in the morning and were hampering her ability to perform her work as a CNA as well as interact with co-workers and family. R. 36-38. She also stated that her daily life required her to perform self-care, housework that requires intermittent breaks, prepare meals for her family and drive short distances for doctor appointments. R. 32-33, 41. Freitas further testified that she was able to lift and carry no more than ten pounds and was able to sit for up to one hour. R. 34-35. Freitas indicated that in light of her fatigue, fibromyalgia pain, depression,

9

headaches and anxiety attacks, she felt unable to continue working. R. 36-40, 46.

### b. Sabella's Testimony

The VE testified that Freitas' past work as a sewing machine operator was light and semi-skilled while her work as a CNA was medium and semi-skilled. R. 49. The VE testified that given a hypothetical claimant with Freitas' age, education, work background and residual function capacity which would include sedentary work, unskilled work tasks and where the claimant would need work breaks on average every two hours throughout the day, the hypothetical claimant would not be able to return to Freitas' past work, but that there were sedentary, unskilled jobs in the regional economy, involving assembly, packaging and inspection that the hypothetical claimant could perform. R. 50. The VE also testified that if the same hypothetical claimant had a moderately severe impairment in her ability to maintain attention and concentration, she would not be able to perform the sedentary, unskilled jobs listed above. R. 50-51. The ALJ also asked the VE about tolerance for unscheduled work absences in the jobs referenced in the first hypothetical to which the VE responded that in general, "two or more days a month on a regular and consistent basis" would preclude employment. R. 51.

### 3. Findings of the ALJ

Following the five-step process set forth at 20 C.F.R. § 416.920, at step one, the ALJ found that Freitas has not engaged in substantial gainful activity since July 1, 2007, the alleged onset date of her disability. R. 10. At step two, the ALJ found that Freitas has the following severe impairments: status post residuals of surgery; fibromyalgia; and major depression with anxiety. Id. At step three, the ALJ found that Freitas does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1. R. 11. Freitas does not dispute the findings at steps one through three.

At step four, the ALJ found that Freitas was unable to perform any past relevant work. R. 16. Freitas does not dispute this finding. The ALJ's finding was based on the determination that Freitas has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except she has a moderate restriction in her ability to maintain concentration and attention. R. 12. Freitas does dispute the ALJ's RFC determination.

The ALJ found at step five that there are jobs that exist in significant numbers in the national economy that Freitas can perform. R. 17. Freitas disputes the finding at step five.

### C. Freitas' Challenges to the ALJ's Findings

#### 1. ALJ's Consideration of the Treating Physician's Reports in determining Freitas' RFC

In determining Freitas' RFC, the ALJ discussed the reports of three treating physicians: Dr. Borja-Chua, Dr. Gorski and Dr. Mansharinani. R. 15-16. Freitas' critique of the ALJ's conclusions rests on her objection that the ALJ gave only some probative value to both Dr. Borja-Chua and Dr. Gorski and did not accord the assessment of Dr. Mansharinani significant probative value. Id.

##### a. Standard of Review

Title 20 C.F.R. § 404.1527 sets forth the standard under which an ALJ must evaluate medical opinions and evidence from physicians. Coggon v. Barnhart, 354 F.Supp.2d 40, 54 (D. Mass. 2005) (discussing the relevant statutes and regulations). "The hearing officer is bound to give 'controlling weight' to the opinions of treating physicians only if 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record,'" Partridge v. Astrue, 754 F.Supp.2d 192, 197 (D. Mass. 2010) (quoting 20 C.F.R. Sec. 404.1527(d)(4)), but "may reject a treating physician's opinion as

11

controlling if it is inconsistent with other substantial evidence in the record, even if that evidence consists of reports from non-treating doctors." Castro v. Barnhart, 198 F.Supp.2d 47, 54 (D. Mass. 2010). If an ALJ properly disregards the conclusions of a treating physician, the "ALJ is entitled 'to piece together the relevant medical facts from the findings and opinions of multiple physicians.'" Cooper v. Astrue, 2011 WL 1163127, at *6 (D. Mass., Mar. 29, 2011) (quoting Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144 (1st Cir. 1987)). "If the choice is supported by substantial evidence, the ALJ may prefer the opinion of a reviewing physician to that of a claimant's treating physician." Id. (citing Arroyo v. Sec'y of Health & Human Servs., 932 F.2d 82, 89 (1st Cir. 1991). If the treating physician's opinion is inconsistent with other substantial evidence in the record, the conflict is for the ALJ—and not the court—to resolve. Rodriguez, 647 F.2d at 222.

### b. Treating Physicians' Medical Assessments

#### I. Physical Treating Physicians

The ALJ considered the reports of Freitas' two physical treating physicians: Dr. Borja-Chua and Dr. Gorski. Dr. Borja-Chua's assessment of Freitas' physical impairments indicated that Freitas could lift up to ten pounds occasionally, carry up to twenty pounds occasionally, sit for four hours, stand for two hours and walk for two hours. R. 1179-1180. The ALJ gave Dr. Borja-Chua's October 8, 2009 assessment some probative value, but did not give the conclusions controlling weight. R. 15-16. Dr. Gorski's assessment indicated Freitas could lift up to twenty pounds occasionally, carry up to twenty pounds occasionally, sit up to four hours, stand for two hours and walk for two hours. R. 1209-10. The ALJ said Dr. Gorski's report "closely tracks" the report of Dr. Borja-Chua and also accorded Dr. Gorski's October 19, 2009 assessment some probative value, but did not give the conclusions controlling weight. R. 16. The ALJ accepted the reports from the

12

treating physicians but rejected the specific conclusion that Freitas can sit for only four hours. R. 15-16.

First, the treating physician reports were not internally supported in the assessments. For example, Dr. Borja-Chua's report stated that the four hour limitation was supported by MRIs of Freitas' lumbar spine and pelvis, R. 1180, but the April 2006 and May 2007 medical report stated that examinations of Freitas' lumbar spine were overall "normal" and "unremarkable" with no signs of critical impairments, R. 230, 588, and the March 2006 medical report stated that Freitas' pelvis "showed no hernia" and otherwise reporting no problems with her pelvis. R. 231. Dr. Gorski came to the same conclusion about the four-hour limitation, but his report stated that Freitas had "pain in abdomen and legs which prevents <u>distance ambulation</u>" (emphasis added) and reported no pain or other problems associated with sitting. R. 1210; <u>see</u> R. 1189-94 (treating notes from Dr. Gorski stating Freitas was "alert" and "sitting comfortably" and did not note seeing Freitas use a cane despite her self-report of same).

Second, as the ALJ noted, R. 15-16, the treating physician's reports were inconsistent with the report of Dr. Matthews, a non-treating physician, which stated that Freitas could sit for six hours, not just four hours as Drs. Borja-Chua and Gorski concluded. That is, although the ALJ did not give their reports full probative value, he did so only to the extent that there was disagreement as to this issue. <u>Id</u>.

The assessment of non-treating physician Dr. Matthews supports the ALJ's Determination. <u>See</u> R. 480 (report of Dr. Matthews); <u>see also</u> R. 973 (report of Dr. Sack, a treating physician, stating Freitas "has full range of motion, without swelling in her...hips, knees and ankles"). Accordingly, there is substantial evidence in the record supporting the ALJ's decision and the ALJ's

conclusion was proper. See infra Section IV(C)(1)(c) (discussing ALJ's determination); Castro, 198 F.Supp.2d at 54; Partridge, 754 F.Supp.2d at 197.

### ii. Mental Treating Physician

Dr. Mansharinani's mental assessment indicated that Freitas has "sig[nificant] palpitations [and] skipped heart beats preventing her from being able to do much physical activity." R. 1228. The ALJ did not accord the October 23, 2009 assessment of Dr. Mansharinani significant probative value because the assessment lacked consistency with the record. R. 16. Specifically, the ALJ concluded that Dr. Mansharinani, without performing a physical examination, made a conclusion about Freitas' physical limitations that was inconsistent with the report from Freitas' cardiologist. R. 16. There is evidence supporting the ALJ's reasons including the objective findings found in the reports of Freitas' treating cardiologist. Compare R. 875-76 (Freitas' cardiology report indicated she had a high average exercise capacity) with R. 1228 (Dr. Mansharinani's concluding that Freitas' physical impairments prevent her from being able to do much physical activity). Additionally, Dr. Mansharinani is a psychiatrist, and as the ALJ correctly noted, Dr. Mansharinani's assessment of Freitas' physical limitations were not well-supported by medically acceptable clinical and laboratory diagnostic techniques for physical evaluations sufficient to justify Dr. Mansharinani's conclusion that Freitas' "palpitations [and] skipped heart beats prevent[ed] her from being able to do much physical activity." See 1228-30 (indicating Dr. Mansharinani's assessment lacked diagnostic questions or assessments to evaluate Freitas' physical limitations). Accordingly, the ALJ's conclusion was proper. See Castro, 198 F.Supp.2d at 54; Partridge, 754 F.Supp.2d at 197.

### c. The ALJ's Determination

Instead of giving controlling weight to the conclusions of Dr. Borja-Chua, Dr. Gorski and

Dr. Mansharinani, the ALJ determined that Freitas had a residual functional capacity to perform sedentary work with a moderate restriction in her ability to maintain concentration and attention. R. 12, 15-16.

Here, the ALJ based his conclusion on the record as a whole and provided substantial evidence for his RFC determination based on (1) the assessment of non-examining physician reviewers, (2) the lack of objective findings on multiple tests, (3) the objective findings found in the treatment notes of the treating physicians, (4) the lack of findings in the record to support some of Freitas' subjective complaints and (5) the testimony at the hearing. R. 16.

First, as to the medical opinions of non-treating reviewing physicians, Dr. Jane Matthews indicated that Freitas could stand, walk and sit with normal breaks for about six hours in a eight-hour work day and occasionally lift twenty pounds and frequently lift ten pounds. R. 480. Dr. Ronald Nappi acknowledged that Freitas had a moderate limitation in her ability to respond appropriately to changes in the work setting, but her ability to interact with the public, ask simple questions, understand and remember simple instructions, interaction with co-workers was not significantly limited. R. 501-02.

Second, despite Freitas' complaints of leg pain and swelling, severe upper back pain, dizziness and headaches, subsequent objective tests produced unremarkable results. See, e.g., R. 216 (a MRI of Freitas' thoracic spine showing a potentially mild degenerative change while the rest of the test was "unremarkable" without evidence of Degenerative Disc Disease); 218 (a bone scan showing "normal spine activity"); 221 (a head CT showing "no evidence of mass or mass effect" or "abnormal mass-enhancing lesions" and "the ventricular system and extra axial spaces appear[ed] normal"); 1095-96 (reports from Dr. Teixeira stating Freitas' "extensive evaluation with endoscopy

15

and radiology," including CAT scan, CT and chest x-ray, were "unremarkable").

Third, objective findings in the notes of the treating physicians also support the ALJ's findings. R. 249 (Dr. Gadd's discharge report after Freitas' breast cancer surgery, show her condition was "stable" and "excellent"); 275-76 (Dr. Stephen's report states that during Freitas' examination, she "appear[ed] healthy", she had "no abdominal mass or tenderness", and "normal gait, stance, balance and cognition"); 864 (Dr. Hodin reported that Freitas was recovering nicely from her thyroid surgery and "would expect no problems at this point").

Fourth, the record does not support Freitas' subjective complaints of fainting, incontinence, stroke and the use of a cane. See, e.g., R. 420 (Dr. Borja-Chua's report indicates that Freitas reported fainting at work but the medical record does not confirm the allegation); 853 (Freitas reported wetting herself to Ms. D'Ambly but no report by a physician confirms this allegation); 1189-94 (treating notes from Dr. Gorski stating Freitas was "alert" and "sitting comfortably" but did not note seeing her use a cane); 1225 (Freitas reported having a mild stroke to Ms. D'Ambly but no report by a physician confirms this allegation).

Finally, the ALJ pointed to the testimony at the hearing and the notes from treating physician reports which confirm that Freitas was engaging in a wide range of daily activities including child care, driving, shopping, cooking, cleaning, watching television and socializing with family. R. 32-34, 1184. Accordingly, the ALJ's RFC determination at step four is supported by substantial evidence. See Rodríguez, 647 F.2d at 222; Evangelista, 826 F.2d at 144; Arroyo, 932 F.2d at 89; Cooper, 2011 WL 1163127, at *6.

   2.     **Questions to the VE**

At step five, the ALJ found that Freitas can perform jobs other than her past relevant work,

16

and thus that Freitas was not disabled. R. 17. Freitas argues that the testimony of the vocational expert compels a finding that she is disabled, and that the ALJ erred by finding otherwise. Pl. Memo at 3.

"[I]n order for a vocational expert's answer to a hypothetical to be relevant, the inputs into that hypothetical must correspond to the conclusions that are supported by the outputs from the medical authorities. To guarantee that correspondence, the [ALJ] must both clarify the outputs (deciding what testimony will be credited and resolving ambiguities), and accurately transmit the clarified output to the expert in the form of assumptions." Arocho v. Sec'y of Health and Human Servs., 670 F.2d 374, 375 (1st Cir. 1982).

Here, the ALJ defined the term "moderate" limitation as one describing "a claimant [who] is able to maintain concentration and attention to perform simple work tasks for an eight-hour work day, *assuming short work breaks on average every two hours*." R. 12 n.1 (emphasis added). In the first hypothetical he posed to the VE, the ALJ implicitly referenced this definition when he described a hypothetical claimant limited to "essentially unskilled" work tasks and requiring "work breaks on average every two hours throughout her day." R. 49-50.[5] The VE testified that such a

---

[5]The full exchange between the ALJ and VE as to this hypothetical was:
Q: I'd like you to consider a hypothetical claimant of the same age, education and work background as this claimant with a residual functional capacity for work, which would include a range of sedentary work. The claimant would be further limited to, essentially, unskilled work tasks. She would need work breaks on average every two hours throughout her day. With these limitations, the claimant's past work would be ruled out?
A: Yes.
Q: Are you able to identify any jobs in the regional economy that could be performed within the constraints I've described?
A: Yes. Sedentary, unskilled work, general occupational categories of assembly, packaging and inspection types of work . . . . The numbers of those types of jobs in the Rhode Island and Southeastern Massachusetts labor market would be about 4,000-5,000.

hypothetical claimant could perform jobs in the regional economy. R. 50. The ALJ was correct to rely on this relevant exchange because the inputs into the hypothetical correspond to the conclusions that were supported by the outputs from the VE. Arocho, 670 F.2d at 375.

Freitas argues that, because the ALJ found that Freitas had a "moderate restriction in her ability to maintain concentration and attention," and because the VE testified that a claimant with a "moderately severe impairment in her ability to maintain concentration and attention" would be "preclude[d]" from the types of work specified by the ALJ,[6] the ALJ was compelled to find that Freitas was precluded from the work specified by the ALJ and, accordingly, that Freitas is entitled to disability benefits.

Freitas' argument is unavailing. "Moderate" limitations and "moderately severe" limitations are not the same; the former are less severe than the latter. See Torres v. Astrue, 2010 WL 3001172, at *4 (D. Mass., July 29, 2010) (concluding there was a substantial basis for the ALJ to determine that Torres' difficulties in maintaining concentration, persistence and pace were "moderate" instead of "moderately severe"). "[A]n [ALJ] may, and often should, pose a series of hypothetical questions to an expert; the factual assumptions in one or more of those questions may, and often should, be inconsistent with those in one or more of the others. That is the means by which the administrative law judge explores all of the possible outcomes raised by the record." Rankins v. Barnhart, 2004

---

R. 49-50

[6]The exchange between the ALJ and VE regarding this hypothetical was:
Q: If the claimant had a moderately severe impairment in her ability to maintain concentration and attention, would that change your answer?
A: Yes. It would preclude those types of jobs, because they are dependent on maintaining attention and concentration to maintain persistence of pace and quality, and meet production expectations.
R. 50-51.

18

WL 1896993, at *2 (D. Me., Aug. 25, 2004).

Here, the ALJ posed a series of hypothetical questions to the VE. The ALJ posed the first hypothetical which described, in substance, a claimant with a "moderate" limitation and he also posed the second hypothetical about a claimant with a "moderately severe" limitation. The ALJ found that Freitas' medical records showed that Freitas only had a "moderate restriction" regarding concentration and attention, R. 12, and, therefore, properly relied upon the VE's response to the first hypothetical which assumed a moderate restriction, not the latter hypothetical which did not comport with the ALJ's findings. Arocho, 670 F.2d at 375; see Torres, 2010 WL 3001172, at *4.

## V. Conclusion

Based on the foregoing, the Commissioner's motion to affirm is GRANTED and Freitas' motion to reverse is DENIED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge